Hamilton Cole, Referee.
Before the commencement of the trial before me, the plaintiff, Russell D. Miner, died, and the action was revived in the name of his executrix, Matilda D. Walbridge, During the pendency of the action before me, Matilda D. Walbridge also died, and the action was again revived in the name of Matilda W. Stevens, as administratrix of Russell D. Miner, with the will annexed.
In the opinion of the general term of this court, above referred to, so full and accurate a statement of the facts bearing upon the question of the title to the property mentioned was made, that it is unnecessary that they should be re-stated here. The question of *278 fraud must be examined here as an original question, and upon this point no aid can be obtained from the opinion of the general term. That question was not involved in the determination of the case as there presented.
The case now' made does not greatly vary from the case before the general term. Some of the documents then in evidence are now omitted entirely, or are in evidence in a restricted form, as bearing merely upon the intent of the defendants’ agent in procuring the deed which will be hereafter considered ; and the petition of John Woodward, and the report thereupon, which were before the court at general term on an appeal from an order denying a motion for a new trial, on the ground of surprise and newly discovered evidence, are now in the case; but it appears from a reference to the opinion of the general term, at page 199, that they considered this petition and report in their investigation of the case. So far as the facts established on the former trial bearing upon the question of title are concerned, leaving out of view, for the present, those matters which the general term held to be questions for the jury to pass upon, I think the case now made is substantially the same as that presented to the general term of this court.
The first question to be determined is the nature and extent of the interest of Russell D. Miner in the property in question, on July 7, 1866 ; and if it shall appear that on that day Russell D. Miner was- the absolute owner in fee, and entitled to the possession of the said property, it will then become necessary to examine the question of fraud, upon the determination of which this action must then depend.
The plaintiff insists that the question of title is not necessarily to be determined from the evidence in this case, and claims that subdivision 5 of the defendants’ answer constitutes an admission of record that the title *279 to the property in question was in Miner, on July 7, 1866, which the defendants cannot contradict, explain away, or deny ; and this claim is, I suppose, based upon either of two familiar principles of law: One, that a grantee, holding and claiming under a deed, is bound by the recitals, and liable upon the covenants contained in the deed; or upon the well-settled principle, that parties to actions are not allowed to deny facts established by the pleadings. The first principle can hardly be made to apply in this case in such a manner as to prevent the defendants from questioning the extent of the interest conveyed to them by the deed from Miner ; and as to the application of the other principle mentioned, I think the fact alleged in subdivision f> is, that Miner did, on the day mentioned, •execute and deliver to the defendants a conveyance of the premises in question, and that this is the fact which cannot be contradicted by the defendants. The effect of the whole answer is to contradict that such conveyance was operative to convey any interest in the premises, inasmuch as the pleadings, taken as a whole, clearly put in issue Miner’s title.
The question of title must be determined upon the proof and not upon the pleadings in the case.
The defendants insist that the record under which Miner claims title to the property in question fails to establish such title, because :
1. The grant from the defendants to David Wag-staff, in 1801, did not convey land to the center of the old street adjoining lot 143.
2. If title to the center of these old streets was conveyed to David Wagstaff by the deed, such title did not pass beyond John Woodward, and the deed from him to William Wagstaff did not pass such title.
3. If in law the legal title to the premises in question did, by the prior deed, vest in Miner, and if, on July 7, 1866, such title, so far as all records showed, *280 was absolute in Miner; still he cannot enforce such title, because, by the acts or acquiescence of himself and his ancestors in the title, a boundary line between lot 143 and lot 140, then owned by the defendants, excluding the premises in question, had been -established and acquiesced in by all parties interested for more than twenty years prior to the commencement of this action.
4. That an estoppel in pais has been worked against Miner by his own acts in standing silently by and allowing the defendants to pay taxes and assessments upon the property in question, which precludes him or his successors in interest from now asserting title to said premises. '
Unless the law has been changed since the decision of the general term in this matter, the first two points taken by the defendants have been expressly overruled. The general term of this court held that the deed from the defendants to David Wagstaff conveyed to him the premises in dispute, and although, in the opinion, the effect of the intermediate deeds from David Wagstaff down to Russell D. Miner was not commented upon, these deeds must have been considered by the court. It was held that Miner had a good record title, and to decide this, the whole chain of title must have been considered. Under these' circumstances a referee or a judge sitting at trial term would and should require very decisive proof that some new facts had been injected into the case, which would require different principles of law to be applicable, or that the principles of law laid down by the general term of the court had been clearly overruled.
I think it now established that deeds conveying property bounded by a highway, water-course or public street, are to be construed in the light of the intent of the parties, and not upon principles of public policy merely, and it may be that this principle of law has *281 been authoritatively announced since the decision of the general term in this case (English v. Brennan, 60 N. Y. 609 ; White’s Bank of Buffalo v. Nichols, 64 Id. 65; Mott v. Mott, opinion Ct. of Appeals, not yet reported).
If the terms of the deed be clear, this intent must be ascertained from the terms of the deed itself; if the terms of the deed be ambiguous, then the intent of the parties may be shown by evidence aliunde, and the situation and condition of the parties and of the subject-matter may be considered in determining such intent; but giving the defendants the benefit of any doubt upon this point, and considering both the terms of the deed from the defendants to David Wagstaff, the situation of the parties and of the subject-matter of the grant, and all the evidence in the case bearing upon the question of intent, I still should come to the same conclusion as the general term in my construction of this deed. The boundary in the deed is by a street sixty feet in breadth, but the street is nevertheless the boundary and not the side of it. The law is too clearly established in this State for me to. even temporarily disturb it, that where a boundary is mentioned as an entirety the deed conveys to the center of the boundary, and the fact that the boundary is described as having space and not as a line, does not, to my mind, convey any impression that the grantor intended his grant to stop short at the side of. the space which is mentioned and described as an entirety.
Nor do I think that the coloring on the Goerckmap shows an intent on the part of the defendants to exclude from the grant to David Wagstaff the street on the south of lot 143. If we can consider the coloring at all, and are not bound to be governed in construing this map by the lines, we must, I think, consider the scheme as laid down in the Gtoerckmap, and the fact *282 therefore becomes material that if this intent, on the part of the defendants, to exclude from the grant to David Wagstafl the street on the south of lot 143, is to be inferred "from the coloring on Groerck’s map,, it must also be inferred that the whole street on the north of lot 143 would be included in the grant of lot 143. The intent to exclude the one would necessarily include the intent to include the other, and neither can, I think, be j ustly inferred.
Nor does the situation of the parties to this deed make the inference at all necessary that the defendants intended that the grant to David Wagstafl should stop short at the northerly line of the old street. No right to possession in the old street passed to the contiguous owner until it was closed. The defendants, at any time prior to the closing of the street, could have actually opened it without paying anything to the adjoining owners for the land, and this was the only purpose and object for which the defendants could wish to retain any interest in these old streets. There appears to be no reason why the defendants should desire to retain any interest whatever in these old streets after they had been definitely abandoned as highways.
I think John Woodward by his deed to William Wagstafl intended to and did convey all the interest he had in lot 143. This conveyance was made in 1833. Seventy-ninth street had then been opened, and Seventy-eighth street, as afterwards, in 1850, opened, had been laid out on the map made and filed in April, 1811, under the act of April 3, 1807. Seventy-ninth street, as opened, was just to the north of the old Ninety-ninth street, as laid down in the Groerck map, and included no part of that old street; while Seventy-eighth street was partly on lot 143, and a strip of its southerly part between Fourth and Fifth avenues and about five feet in width was on the north part of *283 Seventy-eighth street, as laid down on the Goerck map. When Woodward made his conveyance to William Wagstaff, the fences which he had erected around lot 143 included the old Seventy-ninth street on the north and excluded the old Seventy-eighth street on the south, but it seems clear to me that he did not understand that the boundaries which he had made about lot 143 properly included his property, for he petitions the common council to reform the lines about his property so as to conform to these boundaries.
This is not done when he conveys to William Wag-staff lot 143, according to the Goerck map, “ and not otherwise.'’"' He substantially says : I am in possession of land to which I have no title. My title depends upon the Goerck map. I will convey to you by that map. The legal effect of the deed to William Wag-staff, standing’ by itself, was to convey to him the premises in dispute, and this legal effect is not to be overcome by shadowy inferences. If the construction of the Goerck map and of Woodward’s acts, as contended for by the defendants, be correct, then we must assume that Woodward intended to grant to William Wagstaff all of the old street to the north of lot 143, which he did not claim to own, as shown by his petition to the common council.
The additional language in the deed, after the description, to the effect that the lands are conveyed according to the Goerck map, and not otherwise, indicates, to my mind, that Woodward knew at the time that he was not on the land which he really owned, and he therefore proposed to convey to William Wag-staff not the land which he (Woodward) was occupying, but the land which he owned under the conveyances to him, and he therefore, in the grant, distinctly refers to his own sources of title, and takes care to say, in his grant, that not his apparent right, as evidenced by his possession, but that his record title shall *284 determine the amount of his grant. Whatever interest was granted by the defendants in 1801 to David Wag-staff descended, in my opinion, by an unbroken chain of title to, and was, so far as the records showed, on. July 7, 1866, vested in Russell D. Miner.
I now come to the consideration of a question very carefully argued in this case, the question of practical location. The defendants insist that the boundary line between lot 143 and the premises of the defendants, on the south was by the parties in interest practically located so as to exclude from lot 143 the premises in question, and that for more than twenty years previous to the commencement' of this action there was an acquiescence in such practical location, on the part of all parties interested therein or aSpcted thereby.
On the former trial the decision appeared to rest upon the ground that Minor’s grantors, or some of them, had abandoned .to the defendants the premises in question, and in exchange therefor, had entered upon, occupied and enjoyed a strip of land on the south side of Seventy-ninth street, as opened, equal or exceeding in amount and value the land so abandoned on the south side of Seventy-eighth street. This would seem to amount to an oral exchange of lands, and it is not now claimed that this can be done. The defendants now claim, entirely irrespective of what took place between Miner’s grantors and the defendants, in relation to lands on the south of Seventy-ninth street, andmorth of lot 143, that by the acts of the parties in interest the boundary line .on the south of lot 143 was to established as to exclude from lot 143 the strip of land now involved in this controversy.
The facts upon which this claim is based, I understand to be as follows : The first line claimed is shown in the Randall map (Exhibit No. 8). There is no evidence when or by whom, or for what purpose this line was established, or when it was abandoned. It did *285 not exist in 1822, when Mr. Ludlum made his survey of the common lands.
In 1822 it seems that there was a continuous fence which appeared to have been standing a long time, .and which stood on the southern boundary of lot 143, excluding the whole of the old street to the south of the lot. How long it had stood there does not appear, nor by whom or for what purpose placed there. The custom, as shown by the evidence in the case, for the occupants of these lots to occupy and cultivate the whole of the street on the north of each lot, may indicate an explanation of the situation of this fence. Before 1832, this fence was changed to a line immediately north of Seventy-eighth street; but, if we consider the line referred to in Woodward memorial, as the same line in existence in 1822, this fence did not exist in 1836, when Miller took possession of the premises between Seventy-eighth and Seventy-ninth streets, Fourth and Fifth avenues,.as Wooley’s tenants.
It is true that Wooley did mortgage down to this line, but the mortgage to Joshua Jones was made by him when his petition for a reformation of the lines about his property was before the common council; .and his pointing out to Miller thisdine as his southern boundary was also done while his petition was before the common council, or about the time it was presented ; for Miller went into possession about 1836, .and Wooley’s petition was laid before the common council on the 26th of that month. As he was to lease the land to Miller, it might well be that he only desired to indicate to him the property, bounded as it would be if his petition was favorably acted upon ; and his statement that the land below belonged to the corporation, may well be explained as a mere statement to Miller, informing him who was situated next to the land he was to occupy. I could not find from the testimony that this northerly line of Seventy-eighth street *286 was ever acquiesced in by the parties in interest as the boundary line between lots 140 and 143. Wooley attempted to have it established as his southern boundary line, but failed in the attempt, the evidence not showing that he ever assented to the defendants’ proposition in this regard.
Even if Wooley did understand tliat this line was his southern boundary, it not appearing that it was originally established as a boundary line, Wooley’s acquiescence, if any, did not continue for a sufficient length of time to.bar a right of entry; for he came into possession in 1834, and deeded to Miner in 1842. I do not find evidence of any acquiescence in this line, by Wooley’s grantors.
The next line upon the southern boundary of lot 143, was the fence erected in June, 1841, by Williams, who was in the employment of Allerton, who was the tenant of the defendants, and in possession of lot 140. This fence was erected to keep out cattle from the inclosure occupied by Miller, on the north. It was not upon the line formerly pointed out by Wooley to Miller. There is no proof of any acquiescence, of any one on behalf of the owner of lot 143 in its erection or continuance, and it only existed until 1856, when, in grading Seventy-eighth street, it disappeared.
Here were four, or, if w'e consider the line upon Ludlum’s survey and the line referred to in Woodward’s memorial as the same line, we have three different lines, no one of which, in my opinion, has the requisites necessary to establish it as the boundary line between lots 140 and 143, by practical location.
Ho one of these lines appears to have been erected as a boundary line, although I do not think this to be necessary to establish a boundary by practical location (Dunham v. Stuyvesant, 11 Johns. 569; Jones v. Smith, 64 N. Y. 180).
I do not think it necessary, that where there is no *287 agreement between the parties as to the boundary line, and a division line has been actually in existence, the fact of acquiescence in this line as a boundary line, by the parties in interest, for not less than twenty years, must be found to establish the division line as a boundary line by practical location ; and I can find no such fact as to any of the lines mentioned, from the evidence in this case.
It is true that all of these lines included the premises in dispute, and would exclude them from lot 143 ; and this would prove an important fact, if the defendants could show an occupancy of the premises excluded by these lines from lot 143, for a sufficiently long space of time to bar a right of entry. In such case it might be claimed that the greater included the less, but this principle has no application to the practical location of a line.
I should not find that these lines were placed where they were under the intent of the parties to place them on the northerly line of Seventy-eighth street, as laid down on the Gloerck map, and even if such were their intent, it is not the intent of the parties, but the actual location, which establishes the line. The intent of the parties to erect their fences upon a line capable of ascertainment, might, in certain cases, be of importance in ascertaining the construction to be put upon the deeds under which they held ; but I do not understand that a line can be practically located by an intention in the minds of the parties to locate it in a certain place, when, in fact, they locate it somewhere else. It is the fact of the location, and not the intent of the parties, which must govern.
Under the evidence no estoppel in pais is established against Miner. Independent of the difficulty of holding that a mere payment of taxes and assessments upon land by one claiming title thereto, would preclude the true owner from asserting his title, even if he *288 knew of such paymen fcs at the time they were made, there is no evidence that Miner knew anything about these payments made by the defendants. All the elements necessary to establish an estoppel in pais are wanting in this case.
I am, therefore, of the opinion that, on July 7, 1866, Russell D. Miner was the owner, and entitled to the possession, of the property in question.
On July 7, 1866, Russell D. Miner executed a conveyance to the defendants, whereby, for the sum of $25, he granted, bargained, sold, aliened, remised, released, conveyed- and confirmed to the defendants
“All the northerly half of an old street lying between the lots number 140 and 143, on the map of the common lands of the city of ISTew York. Bounded northerly by said lot number 143, southerly by the center line of said old road, easterly by the east road, and westerly by the middle road, as laid down on said map.”
This deed conveyed to the defendants the premises in dispute, and the question must now be determined whether Miner was induced to execute and deliver this deed through the fraud or fraudulent procurement of the defendants.
On May 21, 1866, the defendants sold at auction a number of lots situated upon the south side of Seventy-eighth street, and between Fourth and Fifth avenues. Within the area so sold, was embraced the strip of land in controversy in this case.
A Mr. Sternberger purchased at that sale lot number 5, as shown on map. Mr. Sternberger employed Messrs. J. H. and S. Biker, counselors at law, to examine the title to the property so purchased by him. They found that by the deeds on record- the title to the southerly half of Seventy-eighth street, as laid down on the Goerck map, was in Russell D. Miner as former owner of lot 143. This was a cloud upon the title pro *289 posed to be conveyed to their client by the defendants. They communicated the fact to the then mayor of the defendants, John T. Hoffman, and were requested by him to make a thorough examination of the title to the strip of land in question. They did so. They examined the records in the register’s office. They investigated the acts of Miner and his grantors in and about lot 143 ; they unearthed and examined nearly all the documents which have been put in evidence in this case, except the petition of John Woodward, and-the report thereupon; they investigated the facts in regard to the boundaries made about" lot 143, and the occupation within those boundaries. They reported to Mayor Hoffman that the paper title to this strip of land in dispute was in Russell D. Miner, but that Wooley, Miner’s grantor, had occupied and had the benefit of a strip of land on the north of lot 143, the legal title to which was in the city of New York, and that it was fair and equitable to ask Miner for a release of this strip on the south of lot 143. The mayor authorized them to obtain such release.
So far no communication had been had with Miner.
On the morning of July 7, 1866, Mr. John H. Biker called upon Russell D. Miner, who was a clerk in a grocery store, at the corner of Watts and Yarick streets, in this city; and had a conversation with him, relative to giving a release to the defendants of the strip of land in controversy.
The account of the interviews on this subject, as given by Mr. Biker and Mr.' Miner, do not differ more than is to be expected in cases of this character. Mr. Biker says he was at the store corner of Watts and Yarick streets twice on July 7, 1866 ; while Mr. Miner says he saw Mr. Biker but once on that day, but that a day or so before two gentlemen were in, and they called for cider, and in the conversation mentioned Becorder Biker, and Miner said that he knew him, and *290 asked whether either of the gentlemen was Recorder Biker’s son, and the reply was “no,” either “nephew” or “ cousin.” Thus it seems that Miner remembered two occasions, near July 7, 1866, when a Mr. Biker was in the store, and I have no doubt but that these two occasions are those testified to by John H. Biker.
Nor have I any doubt that the statement made by John H Biker, as to what took place between him and Miner on July 7, 1866, is true. I think that his statement is much more likely to be strictly accurate than Miner’s statement, and it must be noticed tbit in some very important points they agree. Miner says that Biker told him that the city of New York had been selling or was about selling land, and that it was necessary for them to have his (Miner’s) signature, in order to enable them to give a good title; and that the matter was in relation to some land conveyed to him by Mr. Wooley; that the object in obtaining Miner’s signature was to enable the city to give a warranty deed; and, in the complaint, Miner states that he was informed that he had some claim to the property in question, but that it was a mere equitable claim and of no value. I think the statements made by Mr. Biker are the substantial truth in the case ; that there were two interviews, I have no doubt. It would be very unusual for any one to prepare a deed or release without knowing whether it would be executed or not, and then, the first time the parties met, abruptly put forward the release and ask for a signature. The more natural way would be to do what was done in this case—discover whether the release would be executed, and then prepare it and apply for a signature.
In the conversation between John H. Biker and Miner, Miner said that Wooley was his brother-in-law, and that he (Miner) at one time owned some land in the vicinity of Seventy-eighth and Seventy ninth *291 streets. Mr. Biker then told him that the city had been making a large sale of lots between Fourth and Fifth avenues, and that his firm had been employed to examine the title to one of these lots ; that they had found that a part of the land on the south side of Seventy-eighth street, between Fourth and Fifth avenues, was included in an old street between lots 140 and 143 of the common lands ; that it appeared by the record that Mr. Wooley and he (Miner) had owned lot 143 ; that they (Messrs. Biker) considered that his (Miner’s) title extended to the middle of the old street. Mr. Miner said that he claimed no interest in land in that vicinity; that that was settled long ago. Mr. Biker then told him of an adjustment which Mr. Wooley had made with the corporation, by which Mr. Wooley had taken the strip to the north of lot 143 ; that no deed could be found in the registers office from him (Miner) or Wooley, carrying out Wooley’s part of the bargain, and asked Miner if he would release to the corporation the land on the south side of Seventy-eighth street, included in the old street, between lots 140 and 143, and Miner said he would ; Mr. Biker then told Miner that he did not want the release for himself, but for the city, and asked Miner if he would execute a release to the city if he (Biker) prepared one, and Miner said he would. Mr. Biker then went to his office, where a deed or release was prepared, and, between two and three o’clock of the same day, went back to the store where Mr. Miner was, told him that he had brought the release, filled in the blanks in Miner’s presence, read over the instrument to Miner down to the habendum clause. Miner signed it. It was witnessed by Mr. Biker, and recorded the same afternoon. The instrument was dated June 7, 1866. The firm of J. H. ,and S. Biker charged to and received from the defendants, for their services in examining the title and procuring this release, $1,000. They fur *292 nished to the city an abstract in which it was stated that the Wooley mortgages did not affect the property in question.
The fraud claimed in this case is fraud upon the part of John H. Biker, in procuring this deed or release from Mr. Miner. Although very many authorities have been cited upon the argument, the question of actual fraud and fraudulent intent is purely one of fact, and very little aid can be derived upon this point from decided cases. In this case I only know John H. Biker from the record. By that his conduct must be judged. Of course, a referee has a right to consider the appearance of the witnesses: but, upon the record alone, the general conviction forced upon my mind,,, from the whole case, is that the conduct of John H. Biker in this transaction was perfectly honorable- and straightforward, and in every way consistent with the highest integrity.
It will not do to examine this question of fraud in the light of the present knowledge of those who have been for a long time actively interested in this case. We must place ourselves, as far as we can, in Mr. Biker’s position in 1866, when the questions in this case were new, and determine, if possible, how, then, they would strike the mind. We all know how principles of law, by careful study and laborious application, become so clear to our minds that we wonder how we ever could have been in doubt, and it is not at all surprising if Mr. Biker’s opinion upon the legal questions involved in this case was somewhat different from what, by very acute analysis and most laborious investigation, has so far been decided to be the law in this case, without any absolute certainty that the correct law has yet been laid down.
Wooley had apparently acted upon the report of the common council made upon his petition. Judge Ingraham, his counsel, thought Wooley had actually *293 executed a release to the city of the land to the south of lot 143, comprised in Seventy-eighth street, as laid down on the Goerck map ; and without going into nice questions of law, it would naturally seem just and fair that if Miner’s grantors had occupied and had the substantial ownership of property equally valuable, to the north of lot 143, which belonged to the city, that Miner should release to the city this strip on the south. I do not say that these were the actual facts, but I do say they must be considered as actual facts in examining this question of fraiid, for Biker believed them to be so. It is especially to be noticed that on the first trial the court considered the facts upon which Mr. John H. Biker acted to be conclusively proved, and that substantially, upon the evidence before Mr. Biker in 1866, and the law was applied as Mr. Biker understood it in 1866.
Nor does a minute examination of the evidence in detail and of all the separate parts of it which the plaintiff’s counsel claims establish fraud on Biker’s part, and consequently on the part of the defendants, enable me to discover any such fraud.
The contrast between the parties to the transaction —on the one hand, the powerful city of New York, on the other, an obscure clerk in a modest grocery store— is sufficiently striking, but I do not see how this difference in the position of the parties is of any importance unless the power of the stronger was improperly exerted upon the weaker. Nor does the small amount of time consumed in obtaining the conveyance amount to anything, unless Miner was induced by Mr. Biker to act hastily and improvidently, and I cannot see that there is evidence warranting such a finding. The annotations upon the abstract as to the effect of the mortgages made by Wooley are in every way consistent with the statement that Mr. Biker regarded these mortgages as having a very important bearing upon Miner’ s' *294 title to the property in question, not as covering the property, but as indicating that Mr. Wooley made no claim to land on the south of the northerly line of Seventy-eighth street as laid down on the G-oerck map, and therefore strengthening Mr. Biker’s theory that Wooley'had abandoned such land and taken the strip on the north of lot 143. The dating of the deed June 7, 1866, when in fact it was executed one month later, can have no possible bearing upon any question of intent to defraud Miner. The taking the description in Miner’s release from the deed from the city to David Wagstaff, in 1801, was the most natural and proper thing to do, when by this deed the record title to the property in dispute had passed from the city. The failure to annex a map of the property to the release is accounted for by the fact that the Messrs. Biker were ignorant that there was an ordinance requiring anything of the kind to be done, while the charge to the city of $1,000, for the services of the Messrs. Biker, was, in my opinion, a very small charge, considering the complications of the case. It seems to me difficult to seriously press this point as a badge of fraud to any one who is familiar with the complications and difficult questions of law involved in this title.
I must find in this case that there was no actual fraud, or intent to deceive Miner on the part of any of the agents of the defendants connected with this transaction.
This, in my opinion, determines this case, for although, where there has been a trial, either party may have any relief ‘ ‘ consistent with the case made by the complaint and embraced within the issue,” where the gravamen of the action is fraud, the fraud must be proved to entitle the plaintiff to any judgment whatever. In my judgment- this complaint presents a clear case of a common law action for deceit, and if this be so the action cannot be maintained without proving *295 actual fraud. If actual fraud—and this would necessarily include an intent to deceive—be proved, then I think the plaintiff could have any judgment, legal or equitable, to which the other facts as proved might entitle her. But, in an action founded on fraud, in which allegations of fraud go to the very foundations of the action, and are not simply attached as incidents to the cause of action, I think no judgment would be consistent with the case made by the complaint and embraced within the issue which did not depend upon fraud as a substantive fact.
But the plaintiff earnestly insists that she is entitled to an equitable judgment declaring that the defendants are trustees for the plaintiff to the amount of the money actually received by them for the property in question, with a provision for an accounting relative to this fund, even though no actual fraud is proved in this case on the part of the defendants. I do not think such a judgment possible under this complaint; but 1 will briefly examine the grounds upon which this claim for equitable relief is based, as stated by the counsel for the plaintiff.
1. As to the difference in general information between the parties :
The case will be examined in vain, I think, for any evidence showing that Miner was not, on July 7, 1866, entirely capable of transacting business, and indeed, some years later, upon the first trial of this case, he appeared to be of fully average strength of mind and intelligence.
“ If a person of ordinary understanding, on whom no fraud has been practiced, makes an improvident bargain, no court of justice can release him from it” (Blackford v. Christian, 1 Knapp, 77).
2. As to the difference in the special information of the parties relative to the subject-matter of the controversy :
*296 Such difference can have no bearing, except with reference to some concealment of fact, and I find that Miner was really informed of all the main facts which were in the possession of John H. Biker.
Nor is such difference in special information material in this case, for there were no relations of confidence here between the defendants or their agents, and Miner and Biker were permitted, under the rules of either law or equity, to “be silent and be safe.”
3. As to the haste or surprise with which it is claimed this transaction was accomplished :
The word surprise seems to be used in equity in two distinct significations—one to support a biff filed on the ground of mistake. With this meaning of the word we have nothing to do in this case, for, unless I misapprehend this case, no action can be here maintained based solely upon mistake, unaccompanied by any fraud or.circumvention.
The other use of the word surprise would seem to include within itself fraud or circumvention, and 1 cannot find any trace of fraud or circumvention in this transaction. There was no management or influence to mislead Miner, there was no pressure brought to bear upon him to cause him to act without due deliberation. If he was willing to sign the deed or release upon the asking, I see no obligation or necessity of any kind resting upon the defendants or their agents to cause him to wait and deliberate. At least they ought not to be found guilty of fraud, actual or constructive, if they fail to do so.
4. Inadequacy of consideration :
As the case stands, there was gross inadequacy of consideration for this transfer to Miner. So far as this bears upon the question of actual fraud, it has already been considered. So far as this bears upon the question of equitable relief and constructive fraud,. *297 I regard it as standing alone ; and inadequacy of consideration, standing by itself, does not constitute a ground to avoid a bargain or a distinct principle of relief in equity.
J. Mitchell Tyng, attorney, and of counsel, for appellant.
Jameson & Mahan, and William C. Whitney, corporation counsel, attorney ; William C. Whitney, corporation counsel; Francis Lynde Stetson, of counsel, tor respondent.*
Under the evidence the plaintiff is the sole party in interest and entitled to maintain this action.
It follows that judgment must be rendered for the defendants.
Judgment having been entered on the report of' the referee in defendants’ favor, plaintiff appealed théreírom to the general term.
By the Court.—Freedman, J.
After a careful examination of the whole cáse I have arrived at the conclusion that no error was committed by the= learned referee. His rulings upon questions of evidence were clearly right; the facts found by him are not only supported, but they were called for, by the proofs ; and his conclusions of law flow from the facts as found. The plaintiff failed to establish the existence of the elements essential to the maintenance of an action for either actual or constructive fraud, unless-gross inadequacy of consideration of itself is sufficient to sustain it. But according to well established, principles this is not enough.
*298 For the reasons assigned by the referee in his opinion, which seems to have been well considered and is quite exhaustive, the judgment appealed from should be affirmed, with óosts.
Curtís, Ch. J., and Sedgwick, J., concurred.